# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00629-CV

**James A. Hopkins, Appellant**

**v.**

**Jean C. Hopkins, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. FM103369, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In thirty-six issues, appellant James Hopkins appeals the district court's final decree of divorce. He primarily challenges the portion of the decree that orders the partition of the parties' undivided separate property interest in real property located along IH-35. James argues that he and appellee Jean Hopkins[1] agreed not to sell the IH-35 property without mutual consent, that if the property was subject to partition it should have been partitioned in kind rather than by sale, and that the court erred by entering a final judgment that was inconsistent with both a mediated settlement

---

[1] For ease of reference, we will refer to the parties by their first names.

agreement and a partition and exchange agreement. We will modify the decree and, as modified, affirm.

**BACKGROUND**

After fifty-three years of marriage and eight children, Jean filed for divorce from James on the ground of insupportability.[2] *See* Tex. Fam. Code Ann. § 6.001 (West 1998). James filed a counter-petition for divorce based on the same ground. *See id.* At the time, the Hopkinses owned four pieces of real property that were located (1) on Kramer Lane in Austin; (2) in Hays County, (3) in Jonestown, and (4) along IH-35 near Slaughter Lane (IH-35 property). The Hopkinses are also parties to a condemnation lawsuit regarding compensation for a drainage easement on the IH-35 property.[3]

The Hopkinses attended mediation regarding the divorce action, and, on September 6, 2001, they and their respective attorneys signed a two-page, typed Mediated Settlement Agreement (MSA) with a six-page, handwritten exhibit attached that contains the details of the agreement. *See id.* § 6.602 (West Supp. 2005). The MSA expressly contemplates that it will be incorporated into a "partition or exchange agreement in accordance with the Texas Constitution and

---

[2] At the time of filing, the parties had been separated for six years.

[3] The condemnation case was later tried to a jury, and a final judgment was issued. An appeal was filed in this court, but was abated pending the determination of certain issues in this appeal. *See Hopkins v. State*, 03-03-00499-CV.

the Texas Family Code" in which the parties would make agreements regarding the property listed in Exhibit "A." *See id*. § 4.102 (West Supp. 2005).[4] The typewritten portion of the MSA concludes with the statement "THIS AGREEMENT IS NOT SUBJECT TO REVOCATION." *See id*. § 6.602(b)(1).

Approximately one month later, the Hopkinses, again accompanied by counsel, signed a nineteen-page, wholly typewritten, Partition or Exchange Agreement (PEA) that referenced some terms of the MSA and effectuated a division of their community property. The PEA begins with "stipulations" that the Hopkinses owned certain property described in Schedules A and B and that they intended to partition or exchange those properties between themselves so that "each party, following the execution of this agreement, [would] hold and possess his or her share as his or her sole and separate property." *See id*. § 4.102 (spouses may partition or exchange all or part of their community property, then existing or to be acquired, as spouses desire). They also stated their intent that no future community property would be created during the remainder of their marriage. James claims that when the MSA and PEA were signed, the parties intended to remain legally married, but separated.

Subsequently, the divorce suit proceeded. By that time, according to James, Jean had filed three lawsuits against him: the suit for divorce, a suit requesting partition of the IH-35 property, and a suit for breach of contract. The clerk's record before us does not include documentation of all

---

[4] Section 4.102 was amended in 2003 and 2005. *See* Tex. Fam. Code Ann. § 4.102 (West Supp. 2005). However, the changes only apply to partition or exchange agreements made after the effective date of the amendments. *See id*. The law that was in effect in 2001 governs the Partition or Exchange Agreement in this case. *See id*.

3

three suits, but instead includes only documents related to the suit for divorce. Nonetheless, Jean does not deny that she filed these three separate actions. *See* Tex. R. App. P. 38.1(f) (court will accept facts stated as true unless another party contradicts them). Additionally, the reporter's record includes a transcript of a hearing that was held on September 5, 2002, in which the court called for hearing three cause numbers, including the suit for divorce.[5]

At that hearing, John Scott McNabb, a real estate appraiser, consultant, and broker, testified regarding partition of the IH-35 property. James and Jean also testified regarding their interpretations of the MSA and PEA. James explained why he refused to consent to the sale: he had worked very hard "for forty some odd years to hold on to that property for my children. I don't want it. I don't care about going to Europe. I don't want money now; she does. I want it for my children and grandchildren." Jean elaborated on her reasons for seeking the partition by sale: her daughter had been taking care of her, and Jean was living on a net income of $300 per month because her property had not been liquidated. Finally, each party's attorney testified regarding the amount of attorneys' fees.

On July 15, 2003, the district court entered a final decree granting the divorce and dividing the parties' property. The decree also ordered partition by sale of the IH-35 property, finding that James was entitled to 53%, and Jean to 47%, of the net proceeds from the sale. Jean was also awarded $5,000 in attorneys' fees. Findings of fact and conclusions of law were filed and

---

[5] The court noted that all three cause numbers, GN200163, FM103369, and FM203243, were styled *Hopkins v. Hopkins*, and Jean's attorney stated that she was the plaintiff in all three suits.

subsequently amended. James filed a motion to modify the decree or, alternatively, a motion for new trial. The motions were overruled by operation of law, and this appeal ensued.

## DISCUSSION

The Hopkinses agree that both the MSA and PEA should be enforced, but they disagree as to the terms of the enforcement. James contends in his thirty-six issues that the district court erred by: (1) failing to enter judgment consistent with the terms of the MSA and PEA, which were approved by the court, (2) mischaracterizing separate property as community property, (3) divesting him of his separate property, (4) entering erroneous findings of fact and conclusions of law, (5) entering a decree that is inconsistent with findings of fact, (6) granting relief not requested in Jean's pleadings, and (7) awarding Jean $5,000 in attorneys' fees. He also contends that Jean has failed to comply with certain provisions of the decree, and urges this Court to order enforcement of those provisions.

### Standard of review

In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L&F Distribs.*, 165 S.W.3d 310, 311-12 (Tex. 2005); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank*, 165 S.W.3d at 311-12; *Webster*, 128 S.W.3d at 229. "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *SAS Inst., Inc.*

5

*v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Because neither party claims that the agreements are ambiguous, we may construe them as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 311-12; *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650-51 (Tex. 1999).

**Enforceability of the Mediated Settlement Agreement and the Partition or Exchange Agreement**

The final decree states that the court approved and incorporated the terms of the PEA into the decree, and that any inconsistencies between the PEA and the decree "shall be resolved by the terms of this decree."[6] The decree also references the MSA, stating that the division of property effectuated by the decree "is a just and right division of the parties [sic] marital estate, having due regard for the rights of each party and taking into consideration that the parties have entered into a Mediated Settlement Agreement and a Partition or Exchange Agreement that was filed with the Court on August 6, 2002."

It is clear that the district court attempted to enter a decree that was consistent with the agreements. The court stated in its amended findings of fact that:

(1) The parties made an agreement to resolve the disputes existing between them and reduced the essential terms of that agreement to writing (*i.e.* as reflected in the *Mediated Settlement Agreement* and the *Partition or Exchange Agreement*.)

(2) The terms of [the] parties' agreement (*i.e.* as reflected in the *Mediated Settlement Agreement* and the *Partition or Exchange Agreement* and by the evidence at trial) are reasonably definite and certain.

---

[6] A copy of the PEA is attached to the decree.

6

(3) Both parties performed obligations imposed on him or her by the agreement (*i.e.* the *Mediated Settlement Agreement* and the *Partition or Exchange Agreement*) and by his or her conduct manifested an intention to be bound by the agreement.

The court also concluded that:

(1) The agreement of the parties (*i.e.* the *Mediated Settlement Agreement* and the *Partition or Exchange Agreement*) is binding and enforceable.

(2) The *Court's Final Divorce Decree* effectuates the agreement of the parties (*i.e.* the *Mediated Settlement Agreement* and the *Partition or Exchange Agreement*).

Although James and Jean both seek enforcement of the agreements, they have vastly different interpretations of both their agreements and the final decree.

As an initial matter, we think it is helpful to understand the significant differences between an MSA and a PEA. Section 6.602(a) of the family code provides that "[o]n the written agreement of the parties or on the court's own motion, the court may refer a suit for dissolution of a marriage to mediation." Tex. Fam. Code Ann. § 6.602(a). Subsection (b) states that an MSA is binding on the parties if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

(2) is signed by each party to the agreement; and

(3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

*Id*. § 6.602(b). If the MSA meets these requirements, "a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another

7

rule of law." *Id*. § 6.602(c). Thus, an MSA is a mediated *settlement agreement* that may be the basis for a judgment, notwithstanding any argument under rule 11 or another law. *See* Tex. R. Civ. P. 11; *see also* Tex. Fam. Code Ann. § 6.602.

Section 4.102 of the family code, on the other hand, relates to spousal agreements to partition or exchange community property, without consideration of whether a lawsuit is pending or whether the requirements of section 6.602(b) have been met. Tex. Fam. Code Ann. §§ 4.102, 6.602. Section 4.102 provides that

> [a]t any time, the spouses may partition or exchange between themselves any part of their community property, then existing or to be acquired, as the spouses may desire. Property or a property interest transferred to a spouse by a partition or exchange agreement becomes that spouse's separate property.

*Id*. Furthermore, a partition agreement under section 4.102, unlike an MSA under section 6.602, does not require judicial approval. *Compare id*. § 4.102 ("Property or a property interest transferred to a spouse by a partition or exchange agreement becomes that spouse's separate property.") *with id*. § 6.602(c) ("If a mediated settlement agreement meets the requirements of this section, a party is entitled to judgment on the mediated settlement agreement notwithstanding" rule 11 or another rule of law); *see Byrnes v. Byrnes*, 19 S.W.3d 556, 559 n.2 (Tex. App.—Fort Worth 2000, no pet.) (partition agreement does not require judicial approval); *Patino v. Patino*, 687 S.W.2d 799, 801 (Tex. App.—San Antonio 1985, no writ) (no requirement for judicial approval of partition or exchange agreement).

It is undisputed that the MSA meets the elements of section 6.602(b). *See* Tex. Fam. Code Ann. § 6.602(b). Therefore, the Hopkinses were *entitled to judgment* based on the MSA. *See*

8

*id.* § 6.602(c). However, when the Hopkinses signed the PEA, their community property was actually divided as expressed therein; it became effective and enforceable when it was signed.[7] Furthermore, all of their community property was partitioned into separate property when the PEA was signed because they stated their intentions to (1) divide their community property, (2) "clarify their respective property rights to eliminate any uncertainty about those rights," and (3) not create any future community property during the remainder of their marriage. Having determined that the MSA and PEA are both legally enforceable, we will next consider the legal effect of the plain language of the agreements.

**Did the parties agree to require mutual consent before sale of the IH-35 property or to contractually limit their right to partition by sale?**

In his thirteenth issue, James argues that the district court erred by partitioning the IH-35 property by sale rather than in kind because (1) the parties agreed not to sell the property without mutual consent, and (2) his interest in the property became his separate property that was not subject to partition without his consent. Jean responds that the agreements reflect the parties' decision to sell the IH-35 property, and even if they do not, that partition by sale without the consent of James is not barred by the plain language of the agreements.

---

[7] We recognize that, even when parties have complied with section 6.602, some courts have held PEAs or MSAs unenforceable due to circumstances such as a party's failure to disclose assets or the inclusion of illegal provisions. *See, e.g.*, *Boyd v. Boyd*, 67 S.W.3d 398, 405 (Tex. App.—Fort Worth 2002, no pet.) (failure to disclose bonus); *In re Kasschau*, 11 S.W.3d 305, 314 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (trial court did not clearly abuse its discretion by refusing to enter judgment on mediated settlement agreement containing illegal provision); *see also* Tex. Fam. Code Ann. § 6.602 (West Supp. 2005). There is no allegation in this case, however, that the PEA or MSA is unenforceable; both parties request enforcement of the agreements.

In Exhibit A of the MSA, the parties agreed that the residence on Kramer Lane "will be sold." The residence was later sold for $280,000; each party was entitled to $140,000. In the MSA, PEA, and in testimony before the court, the parties confirmed their intention to ultimately effect an equal division of the proceeds from the sale of the Kramer residence. Because Jean needed money to purchase her own home, however, the parties agreed that Jean would receive $200,000 of the proceeds from the sale of the Kramer residence. This unequal distribution would ultimately be reflected in the parties' ownership of the IH-35 property. That agreement is expressed in Exhibit A. James asserts that in exchange for his consent to distribution of the Kramer proceeds in that manner, Jean agreed to not force the sale of the IH-35 property without his consent. This promise, however, is not expressly articulated in either the MSA or the PEA.

James argues that the language chosen to describe the sale of other real property reflects the parties' intention to not sell the IH-35 property without mutual consent. We disagree. Although the MSA and PEA state that the Jonestown lot and Hays County property "will be listed immediately for sale," the MSA also states that the

> *IH35 property will be partitioned into undivided interests between the parties* to reflect the difference of value Wife/Husband received from sale of Kramer Lane home. For example, <u>if</u> Wife receives a 47% undi[vided] interest and Husband a 53% undi[vided] interest, yearly taxes and note payments will be allocated for payment @ that %. *At the time of sale of all or any part of this property* Wife will receive 47% of net proceeds and husband will receive 53% of net proceeds. Percentages set out herein are *examples with correct figures calculated from actual sales*.

(Emphasis in italics added.) The PEA effectuates this division, reciting that James and Jean each own

> [an] undivided interest in the real property located at 9311 So IH 35 . . .
>
> The undivided interest is to be determined on the basis of the net proceeds which go to the parties out of the sale of the residence, *it being the intent of the parties that after all of the property has been liquidated and divided, each party will have received 50% of all of the property.*

(Emphasis added.) Furthermore, in the next paragraph of the MSA, the Hopkinses agreed that Jean would reimburse James $27,100 "for her share of the community debts with her *proceeds from the sale of the IH 35 property.*" (Emphasis added.) That provision reappears in Schedule D of the PEA, where one of Jean's liabilities is listed as

> The sum of $27,100 to be reimbursed to [James] for her share of community debts paid or to be paid by [James], *such sum to be paid out of her portion of the sale of the IH 35 property if, as and when sold during her lifetime* and she shall authorize the closing agent of the sale to pay such sum to [James] out of those sales proceeds.

(Emphasis added.) Notwithstanding this language contemplating the future sale of the IH-35 property, James asserts that another provision of the PEA reflects the parties' intent to require mutual consent for the sale. James relies on the following paragraph, found in section 4.1 of the PEA, titled "Management of Properties":

> *Each party has the full, free, and unrestricted right to manage the separate property over which he or she has control under section 3.101 of the Texas Family Code* [Managing Separate Property] *or succeeding provisions of similar import and nature, including without limitation the right to convey or encumber the property; to dispose of it by sale, gift, or otherwise; and to deal with it without taking into consideration any rights or interests of the other party.* If the joinder of husband or wife ("joining party") should be required by law in connection with the execution of any document by the other party with respect to the separate property of the other party, on request and from time to time, the joining party must execute all such documents necessary

11

to effect the desires of the other party, including gift tax returns, but without any personal liability of the joining party. *Neither party has the authority to encumber or dispose of the other party's separate property without the other party's express written consent.*

(Emphasis added.) He also contends that this provision precludes the district court from ordering partition by sale without his consent. Jean responds that the provision is not a bar to judicial partition by sale, but is, instead, "boilerplate language that partitions the community estate and establishes each party's separate property interest." We agree.

The property code allows a joint owner of an undivided interest in a piece of real property to "compel a partition of the interest or the property among the joint owners or claimants," Tex. Prop. Code Ann. § 23.001 (West 2000), and that right to partition is generally absolute. *See Moseley v. Hearrell*, 171 S.W.2d 337, 338 (Tex. 1943); *Dierschke v. Central Nat'l Branch of First Nat'l Bank*, 876 S.W.2d 377, 380 (Tex. App.—Austin 1994, no writ). However, the right to partition may be modified or limited by contract. *See Hearrell*, 171 S.W.2d at 339 (if partition not precluded by contract, party may expect cotenant to exercise statutory right of partition at will); *see also Thomas v. McNair*, 882 S.W.2d 870, 878 (Tex. App.—Corpus Christi 1994, no writ) (express agreement not to partition will be honored by courts); *Benson v. Fox*, 589 S.W.2d 823, 825 (Tex. Civ. App.—Tyler 1979, no writ).

The second page of the MSA explicitly states that its provisions "are intended to be incorporated into a final partition or exchange agreement" and that the parties "agree to hold and possess as his/her sole and separate property [sic] in Exhibit 'A.'" *See* Tex. Fam. Code Ann. §§ 4.102, 6.602. Moreover, the third page of Exhibit A recites that the parties "agree[d] to sign [a]

12

partition agreement reflecting terms of this settlement agreement utilizing the partition form set forth in Texas Family Law Form Manual form #48-6." Exhibit A does not contain the exact language used in the PEA and relied upon by James. However, it does state that,

> consistent with the partition agreement referred to herein, it is contemplated that after the execution and implementation of the partition agreement that there will remain no community property and each party will own all property awarded herein as their separate property and shall have the exclusive right to manage and dispose of same and all income derived therefrom shall be the separate property of the owner of same.

We construe the language of the MSA and PEA, taken together, to reflect the parties' intent to partition all community property into separate property, which did not preclude jointly owned property from being partitioned by sale. First, the plain language does not absolutely preclude partition by sale. The parties were attempting to separate their property and clearly contemplated the sale of the IH-35 property, but did not specify that mutual consent of the parties was required. Rather, they clarified that each party's separate property was wholly and separately owned and managed by each individual. Enforcing the intention of the parties as it is expressed in the unambiguous language of the MSA and PEA, *see Frost Nat'l Bank*, 165 S.W.3d at 311-12, we hold that the parties did not (1) require mutual consent before sale of the IH-35 property or (2) contractually limit their right to partition by sale of their undivided interests in the IH-35 property. We overrule James's thirteenth issue.

**Sufficiency of the evidence supporting the partition by sale**

Having found that the agreements did not preclude judicial partition by sale, we consider James's fourteenth, eighteenth, nineteenth, twenty-fifth, and thirtieth issues—essentially

13

challenging whether the evidence is legally and factually sufficient to support the district court's conclusion that the IH-35 property was not susceptible to partition in kind and, therefore, was subject to partition by sale.

We review a district court's conclusions of law *de novo*. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). A district court's conclusions of law may not be challenged for factual insufficiency; however, we may review the court's legal conclusions drawn from the facts to determine their accuracy. *Id.* If a conclusion of law is erroneous, but the court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Id.*

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to fact determinations made by the finder of fact, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711 (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 183 (Tex. 1995).

14

A district court has broad discretion in its determination of a just and right division of community property. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *see also* Tex. Fam. Code Ann. § 7.001 (West 1998) (general rule of property division). However, the court lacks authority to divest a party of separate property as part of a divorce. *See Cameron v. Cameron*, 641 S.W.2d 210, 213-220 (Tex. 1982); *see also Fischer-Stoker v. Stoker*, 174 S.W.3d 272, 282 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Both James and Jean had an undivided *separate property interest* in the IH-35 property pursuant to the express terms of the PEA. *See* Tex. Fam. Code Ann. § 4.102. Thus, our analysis is not based on a just and right division or partition of community property upon divorce, but on legal principles relating to Jean's right to partition by sale of her undivided interest in the jointly held property.

The law favors partition in kind over partition by sale. *Cecola v. Ruley*, 12 S.W.3d 848, 853 (Tex. App.—Texarkana 2000, no pet.). But partition in kind is only proper if the property is "susceptible of a fair and equitable division." *Robertson v. Robertson*, 425 S.W.2d 707, 709 (Tex. Civ. App.—Houston [14th Dist.] 1968, no writ). A party seeking partition by sale must show that partition in kind is impractical or unfair. *Id*. at 853-54. A party is not required to show that partition in kind is physically impossible, but that partition by sale would best serve the parties' interest and restore or preserve the maximum value of the property. *Cecola*, 12 S.W.3d at 855; *Halamka v. Halamka*, 799 S.W.2d 351, 354 (Tex. App.—Texarkana 1990, no writ).

When the right to partition is invoked, the court must determine the interest owned by each owner, any questions of law or equity, and whether the property is susceptible to partition in kind or by sale. Tex. R. Civ. P. 760, 761. If the court finds that a fair and equitable partition can be made, it should order a partition in kind, specifying each party's interest, and appoint disinterested

15

commissioners to divide the property in accordance with those interests. *Id.* 761. If partition in kind would be unfair or inequitable, the property shall be sold and the proceeds divided according to the parties' respective shares. *Id.* 770. If evidence "is conflicting or admits of more than one inference," the issue of whether land can be fairly partitioned is a question to be determined by a finder of fact after a full evidentiary hearing. *Rayson v. Johns*, 524 S.W.2d 380, 382 (Tex. Civ. App.—Texarkana 1975, writ ref'd n.r.e.); *Kuehn v. Wishard*, 452 S.W.2d 5, 9-10 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.); *see Azios v. Slot*, 653 S.W.2d 111, 114 (Tex. App.—Austin 1983, no writ).

John Scott McNabb, a certified general real estate appraiser, consultant and broker, testified at the hearing. McNabb stated that he had reviewed "an engineering exhibit and a plat document" of the land, and that trying to divide the property into two tracts of equal value would be problematic. He explained that the 7.81 acre property was "irregular in shape." Moreover, the State had condemned a drainage easement on the property. "Prior to the taking it had approximately .72 acres of floodplain confined to a drainage channel, and after the [State's] taking, that [] increased to 2.66 acres, which is a substantial portion of this property."

James argues that McNabb's testimony was insufficient evidence to support the partition by sale because his testimony was equivocal. For example, the following discussion occurred:

Q: In your professional opinion as an apprais[er], would dividing up this tract from one intact tract to two divided tracts, would it substantially diminish the total value of the tract? Another way of asking that is, would it be a much more valuable tract of land to be sold as one as opposed to two?

16

A:   Based on what I know—and, again, I don't know all the answers that I would need to accurately answer that. I would say that from a marketing point of view, size would be a benefit, and by cutting it in half, I can almost tell you for certain you'd never be able to cut it into equal size tracts, because of the floodplain problem.

But I would think because it is a very—the seven acres tends to be a better economic unit for commercial development, is going to have more potential user, uses, that would probably be preferable than trying to cut it in half, and deal with smaller tracts, which are going to have limitations. But that I can't be certain of unless I had some help from some other professionals.

McNabb continued:

[B]efore I could embark on a partition appraisal coming up with an equal value cutting it into two parts, I would need a land planner to do an analysis and tell me what the allowable—it's in the Onion Creek watershed. Whether there was wastewater service available to it. The old appraisal cited a cost of $100,000 to bring it to the site. That may no longer be relevant, what the density in terms of impervious cover and buildable square feet would be allowable, what kind of zoning change could be contemplated and probably reasonably likely to be achieved, what could be done under the city's land development ordinances.

. . .

Q:   If you take out three acres as being in the floodplain, does that also make it more difficult to divide it into two tracts of equal value?

A:   Yes, sir, it could because of the configuration of the tract. It could be—again, and I can't answer today without some expertise from some other professionals. The location of the floodplain is obviously in [the] rear of the property along the national [sic] drainage corridor, and because I see conflicting areas of how much there is, that would have to be resolved. Then somebody would have to discuss with city staff what would be a likely zoning. In other words, CS, GR, some sort of commercial—what the allowable uses would be, therefore, what the densities would be, but those issues would help determine if the tract was readily partitionable.

17

On cross examination, James's attorney asked, "Is it susceptible to being partitioned in kind, would you agree with me?" McNabb answered, "It can be divided physically, that is correct."

McNabb testified that the irregular shape of the property, along with the circumstances surrounding the drainage easement, would make the property difficult to divide into two *equal* tracts of land. Furthermore, reducing the size of the property could cause marketing problems. The fact that the property could physically be divided does not controvert McNabb's earlier testimony that it would be difficult to create two equal tracts. However, he also testified that he could not be certain of some of his opinions without consulting other professionals. Thus, the evidence was subject to more than one inference and was subject to determination by the finder of fact—the district court. *See Rayson*, 524 S.W.2d at 382; *Kuehn*, 452 S.W.2d at 9-10; *see also Azios*, 653 S.W.2d at 114. Viewing the record as a whole in the light most favorable to fact determinations by the finder of fact, we hold that the evidence was legally and factually sufficient to support the district court's determination that the property should be partitioned by sale. *See City of Keller*, 168 S.W.3d at 807. James's eighteenth, nineteenth, and twenty-fifth issues are overruled.

**Whether partition in kind or by sale was sought in the pleadings or tried by consent**

In his thirty-fifth issue, James asserts that the court erred by granting the relief of partition by sale when it was not requested in Jean's petition for divorce. *See Latch v. Gratty, Inc.*, 107 S.W.3d 543, 546 (Tex. 2003) (judgment must conform to pleadings unless issue was tried by consent); *Stoner v. Thompson*, 578 S.W.2d 679, 682-83 (Tex. 1979).

Rule 67 of the Texas Rules of Civil Procedure provides that when issues not raised by the pleadings are tried by implied consent, they must be treated in all respects as if they had been

18

raised in the pleadings. Tex. R. Civ. P. 67; *Austin Area Teachers Fed. Credit Union v. First City Bank-Northwest Hills, N.A.*, 825 S.W.2d 795, 800 (Tex. App.—Austin 1992, writ denied). Trial by consent is intended to apply only in exceptional cases where it clearly appears from the record that the parties tried the unpleaded issue. *First City Bank-Northwest Hills, N.A.*, 825 S.W.2d at 800. To determine whether an issue was tried by consent, we examine the record for evidence of trial of the issue, not for evidence of the issue itself. *In re J.M.*, 156 S.W.3d 696, 705 (Tex. App.—Dallas 2005, no pet.); *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 719 (Tex. App.—Dallas 2004, no pet.).

It is undisputed that Jean did not seek partition by sale in her divorce pleadings. Jean responds to James's argument, however, by noting that the trial transcript reflects that the court called cause numbers GN200163, FM103369, and FM203243, all styled *Hopkins v. Hopkins*. She asserts that she sought partition by sale in a pleading filed in another of these three causes. However, the pleadings from GN200163 and FM203243 are not in the record, and the partition by sale was granted in the final decree of divorce.

Jean also contends that, in any event, the issue was tried by consent. We agree. The transcript reveals that almost the entire hearing revolved around the parties' disputed intentions regarding the possible sale of the IH-35 property and whether partition by sale or partition in kind was appropriate. Jean introduced expert testimony—without objection—regarding whether the property could be equally divided into two tracts. At no time did James object to trying the issue of partition of the property. He only disputed whether the agreements wholly barred the sale without his consent and whether partition by sale or in kind was appropriate. In his closing argument, James's attorney argued that the property should be partitioned in kind rather than by sale. Viewing

19

the record as a whole, we find that the parties tried the partition issue by consent. We overrule James's thirty-fifth issue.

**Whether the partition by sale is a divestiture of separate property**

In his fifteenth issue, James argues that the court divested him of his separate property by ordering the partition by sale. Courts lack authority to divest a party of separate property as part of a divorce. *See Cameron*, 641 S.W.2d at 213-20; *see also Stoker*, 174 S.W.3d at 282. However, that prohibition generally refers to the taking of the separate property of one spouse and its transfer to the other. *See Cameron*, 641 S.W.2d at 213 (citing *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex. 1977)). We hold that the district court did not divest James of his separate property by ordering partition by sale because James remains entitled to his ownership percentage of the net proceeds of the sale. We overrule James's fifteenth issue.

**Percentage ownership of the IH-35 property**

In James's fourth, sixth, sixteenth, seventeenth, twenty-fourth, and twenty-ninth issues, he challenges the court's determination of ownership percentages of the IH-35 property. The district court found that after the sale of the IH-35 property, James would be entitled to 53% of the net sales proceeds and Jean would be entitled to 47%.

In the MSA, the parties stated that the

> *IH35 property will be partitioned into undivided interests between the parties to reflect the difference of value Wife/Husband received from sale of Kramer Lane home.* For example, <u>if</u> Wife receives a 47% undi[vided] interest and Husband a 53% undi[vided] interest, yearly taxes and note payments will be allocated for payment @ that %. *At the time of sale of all or any part of this property* Wife will receive 47%

of net proceeds and husband will receive 53% of net proceeds.  *Percentages set out herein are examples with correct figures calculated from actual sales*.

(Emphasis in italics added.)  The PEA also states that

> The undivided interest is to be determined on the basis of the net proceeds which go to the parties out of the sale of the residence, *it being the intent of the parties that after all of the property has been liquidated and divided, each party will have received 50% of all of the property.*

(Emphasis added.)  The agreements recognize that a percentage division of 53/47 is merely an example with correct figures calculated from actual sales—contemplating that ownership could not be calculated without knowing the actual sales prices of both the Kramer residence and the IH-35 property.

In his brief, James bases his argument that he is entitled to 57% of the net proceeds on his unsupported statement that the IH-35 property is worth $1.5 million.  However, at the hearing, he would not agree that the property was worth less than $3 million.  Jean testified that she believed the property was valued at "at least two million, maybe more."  She also testified that at the time the MSA was signed, she understood that "the ultimate ownership" of the IH-35 property would only be determined when the property was sold.  In her brief, Jean acknowledges that "[o]bviously an accurate calculation of percentages cannot be made until the I-35 property is sold.  Having said that, [she] stated to the trial court that she was satisfied with a 53/47 split and that was what she requested."  However, James is not satisfied with receiving 53%.

When the Kramer residence was sold for $280,000, Jean received $200,000, $60,000 more than her 50% interest in the residence.  During questioning by the district court, James

21

explained that the parties' goal of dividing the real property equally would not be achieved by awarding him the first $60,000 from the net proceeds of the sale of the highway property because Jean had received the $60,000 several years ago. James stated that awarding him the initial $60,000 would not provide him with a full 50% interest because of his lost opportunity to invest the money as well as the fact that Jean was benefitting from the appreciation on her separate residence that she purchased in part with the $60,000.

The legislature has defined "interest" as compensation for the use, forbearance, or detention of money. Tex. Fin. Code Ann. § 301.002(a)(4) (West 1998); *see Battaglia v. Alexander*, 177 S.W.3d 893, 907 (Tex. 2005). In the PEA, the parties explicitly stated their intent "that after all of the property has been liquidated and divided, each party will have received 50% of all of the property." Accordingly, in order to effectuate the intent of the parties, James will be sufficiently compensated for Jean's use of his money by (1) Jean's re-payment of $60,000 to James, and (2) Jean's payment of interest on the $60,000. Interest began accruing on the date Jean received the $60,000 from the sale of the Kramer residence, and will end on the date that the $60,000 is unconditionally tendered to James.[8] Interest is awarded at the statutory judgment rate as determined and published by the consumer credit commissioner, *see* Tex. Fin. Code Ann. § 304.003(b), and will

---

[8] In stating that Jean will repay $60,000 to James from her half of the net proceeds of the sale of the IH-35 property, we do not intend to preclude Jean from choosing to repay James at an earlier date if she has funds available from another source. If Jean chooses to repay the $60,000 at a date prior to the distribution of net proceeds from the sale of the IH-35 property, interest began to accrue on the date Jean received the $60,000, and would terminate on the date of unconditional tender of $60,000 plus interest to James.

compound annually. *See* Tex. Fin. Code Ann. §§ 304.003, .006 (West 1998 & Supp. 2005) (citing 2003 provisions).

Therefore, we sustain James's fourth, sixth, sixteenth, seventeenth, twenty-fourth, and twenty-ninth issues to the extent they challenge the court's percentage division of net proceeds from the sale of the IH-35 property. We overrule in part James's twenty-ninth issue to the extent he argues that the evidence is insufficient to support a finding that the parties did not intend to partition their interest in the IH-35 property.

**Enforcement of the agreements**

In his seventh through tenth issues, James argues that the district court erred by failing to enforce the terms of the MSA. First, he contends that Jean owes him money that was expended by him for her "share of the taxes, insurance, and other charges and assessments arising out of the parties' joint ownership of the IH-35, Jonestown, and Hays County properties from and after September 6, 2001." Next, he complains that the court "erred by not ordering [Jean] to execute and deliver the legal instruments sufficient to divest from [her] and to vest in [him] all of [her] rights, title, and interest in and to the three lawsuits, relating to the IH 35 property, sold by [her] to [him] as part of the parties' settlement agreement." Then, in his ninth issue, he argues that the court "erred by not ordering [Jean] to execute and deliver to [him] those documents necessary for [him] to act for [her] in the lawsuits pertaining to the IH 35 property." His tenth issue alleges that the court erred by refusing to enter a judgment that he proposed. Jean responds that he did not seek enforcement in the district court, that there is no evidence to support his claims, and that in any event, she intends

23

to file a separate lawsuit alleging that he failed to accurately report settlement offers by the State in the condemnation proceeding.

Both the MSA and PEA reference the fact that Jean sold her interest in the pending condemnation lawsuit related to the IH-35 property to James for $32,000. Schedule A of the PEA states that James owns, as his separate property, "[a]ll rights, title and interest in and to the condemnation and trespass to try title lawsuit, pertaining to and involving the IH-35 property currently pending in Travis County, Texas." Furthermore, at the hearing, Jean specifically told the district court that she had signed an assignment of her interest in the highway property to James and that she did not have any objection to giving the assignment to James and his attorneys. The final decree orders each party to comply with the terms of the PEA and orders Jean to deliver to James's attorney, by a specified date that has already passed, "an executed special power of attorney authorizing [James] to prosecute, settle, or pursue to completion litigation in cause nos GN100504, GN100295 [sic] and GV100300 in Travis County District Court, and to do all things necessary to conclude those cases, including cashing any and all settlement checks."

James cites *Cayan v. Cayan* in support of his argument that he is not required to file a separate enforcement action. *See* 38 S.W.3d 161, 166 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In *Cayan*, the appellant argued that appellee could only enforce the mediated settlement agreement, following his attempted revocation of it, by suing for breach of contract. *See id*. at 164. The court held that section 6.602 of the family code is a "procedural shortcut for enforcement of mediated settlement agreements in divorce cases" and a breach of contract action was not required. *Id*. at 166. James misconstrues the language of *Cayan*. The "enforcement" in *Cayan* referred to

24

enforcing the terms of the mediated settlement agreement by permitting it to be the basis for entry of a judgment. *See id.*; *see also* Tex. Fam. Code Ann. § 6.602.

In this case, however, James is essentially seeking enforcement of the divorce decree, which he mischaracterizes as enforcement of the agreements. Enforcement of either the decree or agreements in this case requires the resolution of underlying factual disputes that we cannot determine on the record before us. They must be raised in the trial court rather than for the first time on appeal. *See* Tex. R. App. P. 33.1; *see also* Tex. Fam. Code Ann. § 9.001 (West 1998). We overrule James's seventh, eighth, ninth, and tenth issues.

**Findings of fact and conclusions of law**

James challenges the sufficiency of the evidence supporting several express and implied findings.

A district court's findings of fact are reviewed for legal and factual sufficiency of the evidence under the same legal standards as jury verdicts. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). In reviewing a factual sufficiency point, we weigh all of the evidence in the record. *See Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 631 (Tex. 2004); *Jones*, 917 S.W.2d at 772. Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Jones*, 917 S.W.2d at 772 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). In a legal sufficiency challenge, we view the evidence in the light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not. *See City of Keller*, 168 S.W.3d at 807.

25

In his twenty-eighth issue, James contends that there is insufficient evidence to support "an implied finding that as of the date of divorce there existed community property of the parties remaining to be divided by the court, including, in particular, the IH 35 property." He complains about the provision in the decree that recites that "any assets of the parties not awarded or divided by this Final Decree of Divorce are subject to future division as provided in the Texas Family Code." We find that the provision is not an implied finding that community assets existed or an additional term added to the agreements. Instead, it is a statement of the law regarding the district court's jurisdiction in the event future assets are discovered. *See* Tex. Fam. Code Ann. § 9.203 (West 1998) (division of undivided assets when prior court had jurisdiction). We overrule James's twenty-eighth issue.

In his second, eleventh, twelfth, twenty-first and thirty-second issues, he challenges the court's findings that the division of the Hopkinses' community estate is just and right. James is correct that, pursuant to the PEA, no community property existed at the time of the final decree. However, James does not explain how the finding is harmful, and we conclude that any error in such finding is harmless to the extent that he challenges its application to property other than his percentage of ownership of the IH-35 property. Except as to his percentage of ownership of the IH-35 property, the order dividing the parties' specified property comports with the parties' agreements, regardless of the superfluous language regarding a "just and right division" of property that is recited in the order, findings of fact, and conclusions of law. To the extent his argument applies to his percentage of ownership of the IH-35 property, we sustain in part James's second, eleventh, twelfth, twenty-first and thirty-second issues. Regarding all other property referenced in the decree, the district court rendered the proper judgment. Therefore, we overrule James's second, eleventh,

26

twelfth, twenty-first and thirty-second issues. *See Marchand*, 83 S.W.3d at 794 (if conclusion of law is erroneous, but court rendered proper judgment, erroneous conclusion of law does not require reversal).

In his twenty-second and twenty-third issues, James complains that the evidence is insufficient to support the court's finding that he should receive the property listed on Schedule A and that Jean should receive the property listed on Schedule B. Findings of fact eleven and twelve state that James is awarded all property listed on Schedule A, and Jean is awarded all property listed on Schedule B, both of which are attached to the decree. James complains that there is "no evidence in the record supportive of the implied part of the finding that there remained community property to be divided at the time of the divorce." Article 2 of the PEA states, in relevant part, that the parties agreed that James would own, as his separate property, the property listed in Schedule A and that Jean would own, as her separate property, the property listed in Schedule B. James does not complain that the decree awarded Jean property to which she was not entitled. The schedules attached to the decree are virtually identical to the schedules listed in the PEA, with the exception of the Kramer residence that had already been sold, and the IH-35 property that the court ordered partitioned by sale and that we have previously discussed. James does not assert that any error in reciting that the property division of Schedules A and B was just and right (as if the court was dividing community property), was harmful. We find that any error in the court's findings of fact numbers eleven and twelve or in the decree's recitation that it effectuated a just and right division of the parties' property relating to Schedules A and B, was harmless. *See* Tex. R. App. P. 44.1(a). We overrule James's twenty-second and twenty-third issues.

27

**Additional terms in the decree**

In James's third, fifth, twenty-six, and twenty-seventh issues, he complains that the decree included terms to which the parties did not agree. First, the parties' agreement regarding indemnification was limited to certain circumstances. However, the decree orders that

> as a part of the division of the estate of the parties, that any community liability not expressly assumed by a party under this decree is to be paid by the party incurring the liability, and the party incurring the liability shall indemnify and hold the other party and his or her property harmless from any failure to so discharge the liability.

Additionally, James complains that the decree orders the parties to preserve all financial records related to the community estate for seven years, when the agreements do not contain such a requirement.

Generally, a final judgment which is founded upon a settlement agreement reached by the parties must be in strict or literal compliance with that agreement. *Vickrey v. American Youth Camps, Inc.*, 532 S.W.2d 292, 292 (Tex. 1976). Furthermore, under the facts in this case, the MSA is binding and the parties are entitled to judgment on it notwithstanding other rules of law. *See* Tex. Fam. Code Ann. § 6.602. This is not a case in which the court supplied additional terms that were consistent with the parties' agreement. *See Haynes v. Haynes*, 180 S.W.3d 927, 930 (Tex. App.—Dallas 2006, no pet.) (citing *McLendon v. McLendon*, 847 S.W.2d 601, 606 (Tex. App.—Dallas 1992, writ denied)) (law does not require parties to dictate and agree to all provisions to be contained in all documents necessary to effectuate purposes of agreement; it only requires parties to reach agreement as to all material terms of agreement and prevents court from supplying additional terms to which parties have not agreed). Rather, the court inserted provisions regarding

28

indemnification and preservation of records which were not addressed in the parties' agreement. A trial court has no authority to enter a judgment that varies from the terms of a mediated settlement agreement. *See Garcia-Udall v. Udall*, 141 S.W.3d 323, 332 (Tex. App.—Dallas 2004, no pet.). We sustain James's third, fifth, twenty-sixth and twenty-seventh issues.

**Amended finding of fact**

In his thirty-fourth issue, James argues that the district court erred by rendering judgment that does not conform to "the nature of the case proved." Specifically, he complains about the first amended finding of fact:

> From and after September 6, 2001, each party is responsible for paying his or her proportionate share of the mortgage lien payments, taxes, insurance, and other assessments, charges or obligations arising out of the parties' ownership of the IH 35 property.

He argues that the "decree does not show that the parties' obligations in this regard began September 6, 2001." We will assume that he is complaining that the record, instead of the decree, does not support a finding that the parties' responsibilities began on September 6.

On September 6, 2001, the Hopkinses signed the MSA, agreeing to settle the issues regarding their divorce. The MSA contemplated that the IH-35 property would be divided into undivided interests as specified in a PEA, to be entered into subsequently. Furthermore, the MSA provided that yearly taxes and note payments would be allocated to each party based on their percentage of interest, which would be calculated at a later date. As we have already found, the MSA was wholly binding. *See* Tex. Fam. Code Ann. § 6.602. Thus, the district court did not err

in finding that the parties were responsible for their proportionate share of expenses associated with the IH-35 property beginning on September 6. We overrule James's thirty-fourth issue.

**Attorneys' fees**

In his twentieth and thirty-sixth issues, James challenges the court's award of $5,000 in attorneys' fees to Jean. In his twentieth issue, he urges that the evidence is legally and factually insufficient to support a finding that the award of $5,000 was reasonable or necessary. However, nothing in his brief supports that assertion. *See* Tex. R. App. P. 38.1(h) (brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and record). Furthermore, James did not challenge whether the award was reasonable or necessary at trial. At the conclusion of testimony by Jean's attorney, James's attorney stated that he did not have any questions for Jean's attorney because he "never quibble[s] with a man's livelihood." Therefore, he failed to preserve error on that issue. *See* Tex. R. App. P. 33.1(a). We overrule James's twentieth issue.

In his thirty-sixth issue, he contends that the settlement agreement provided that each party would be responsible for his own attorneys' fees, and that there is no authority for awarding attorneys' fees to Jean. He also asserts that if the award is proper, it would only be proper in the other two causes of action for breach of contract and partition of the property, not in this cause number regarding the suit for divorce.

Section 8.9 of the PEA, entitled "Attorney's Fees and Expenses for Enforcement," states that

30

> [i]f either party defaults in performing any obligation under this agreement so that the other party is required to engage the services of an attorney for enforcement or relief, or if either party brings an action or other proceeding to enforce this agreement . . . the defaulting party must pay all reasonable attorney's fees, expert's fees, and other costs of the other party.

There was evidence that James did not cooperate in selling the Kramer property in a timely manner, and that suit was initiated in an effort to force him to cooperate with the sale. Jean's attorney testified that Jean "began to generate attorney's fees after the [MSA,] to enforce it" and that the fees did not include costs for legal representation prior to Jean's suit attempting to enforce the terms of the MSA. Thus, the award of attorneys' fees was proper in the divorce action. We hold that the court properly awarded Jean $5,000 in attorneys' fees. We overrule James's thirty-sixth issue.

**Whether the decree effectuates the parties' agreements**

In his first issue, James generally asserts that the "court erred by entering judgment that does not conform to the parties' mediated settlement agreement." In his thirty-first issue, James generally contends that the court erred by reaching the legal conclusion that the decree effectuates the division of the parties. His thirty-third issue states that the court "erred by rendering judgment that does not conform to the court's findings of fact." He explains that although the court found that the parties made agreements to resolve their disputes and that the agreements were reasonably definite and certain, the court made findings that were inconsistent with the parties' agreements. In light of our discussion and resolution of these issues, we sustain in part and overrule in part his first, thirty-first, and thirty-third issues.

31

## CONCLUSION

We affirm the portion of the district court's decree that partitions the IH-35 property by sale and awards attorneys' fees in the amount of $5,000 in favor of Jean. However, we have sustained James's fourth, sixth, sixteenth, seventeenth, twenty-fourth, and twenty-ninth issues to the extent they challenge the court's percentage division of net proceeds from the sale of the IH-35 property. We modify the decree to reflect that Jean will pay James $60,000, in addition to the statutory judgment rate of interest as determined and published by the consumer credit commissioner. *See* Tex. Fin. Code Ann. § 304.003(b). Interest began accruing on the date Jean received the $60,000 from the sale of the Kramer residence, and will end on the date that the $60,000 plus interest is unconditionally tendered to James. Jean is not required to pay the $60,000 plus interest until the IH-35 property is sold and the net proceeds are distributed, but may pay it before then at her discretion. Regardless of when Jean tenders payment to James, the interest will compound annually.

In order to effectuate the intent of the parties as stated in their agreements, we also modify the provisions in the decree that reference the parties' liability based on the percentages of ownership of the IH-35 property, such as payment of mortgage liens, taxes, insurance, and any encumbrances, to reflect that each party's ownership interest, and thus liability, is 50% rather than the percentage division of 53/47 stated in the decree. Thus, each party shares equal liability for such payments.

We have also sustained James's third, fifth, twenty-sixth and twenty-seventh issues regarding the impermissible addition of terms to the parties' agreements. His first, thirty-first, and thirty-third issues are sustained in part and overruled in part in light of our holdings. We modify the

32

judgment to delete the provision that "as a part of the division of the estate of the parties, that any community liability not expressly assumed by a party under this decree is to be paid by the party incurring the liability, and the party incurring the liability shall indemnify and hold the other party and his or her property harmless from any failure to so discharge the liability." We also delete the sentence that orders the parties to "preserve for a period of seven years from the date of divorce all financial records relating to the community estate."

All of James's remaining issues are overruled. We modify the decree of the district court and, as modified, affirm the decree.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Modified and, as Modified, Affirmed

Filed:   April 27, 2006

33